IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | CRIMINAL ACTION NO. |
| | : | 1:11-CR-41-AT |
| v. | : | |
| | : | |
| ELTON AUGUSTIN, | : | |
| | : | |
| Defendant. | : | |

# **O R D E R**

This matter is before the Court on the Magistrate's Final Report and Recommendation regarding Defendant Elton Augustin's motions to suppress statements he made to law enforcement officers. [Doc. 26]. The Magistrate has recommended that this Court deny Defendant Augustin's motions to suppress. Defendant Augustin has filed objections to the Magistrate's Final Report and Recommendation. [Doc. 27]. For the reasons detailed below, the Court **DENIES** Defendant Augustin's motions to suppress. [Docs. 12 and 21].

## I. **STANDARD FOR REVIEWING MAGISTRATE'S REPORT AND RECOMMENDATION**

The Magistrate issued an Order and Final Report and Recommendation on August 19, 2011, recommending that this Court deny Defendant Augustin's motions to suppress statements he made to law enforcement. (Doc. 26). Under

28 U.S.C. § 636(b)(1), the Court reviews the Magistrate's report and recommendations for clear error if no objections are filed to the report and may "accept, reject, or modify" the magistrate's findings and recommendations. 28 U.S.C. § 636(b)(1). Where the parties do not file any objections, § 636 does not require the district court to review any issue in dispute de novo; however, the statute "does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard." *Thomas v. Arn*, 474 U.S. 140, 154 (1985). On the other hand, if a party files objections, the district court must determine de novo any part of the magistrate's disposition that is the subject of a proper objection. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b).

Defendant Augustin filed timely objections to the Magistrate's Final Report and Recommendation on September 2, 2011. Defendant Augustin has objected to (1) the Magistrate's legal analysis of the custody prong under *Miranda v. Arizona*, 384 U.S. 436 (1966); (2) the Magistrate's perceived failure to consider factors in determining whether a suspect is in custody; (3) the Magistrate's finding that Mr. Augustin was not in custody during his interrogation; and (4) the Magistrate's ultimate denial of Defendant Augustin's motions to suppress statements he made to law enforcement. (Doc. 27 at 6). Because Defendant Augustin has objected to the Magistrate's Final Report and Recommendation, under 28 U.S.C. § 636(b)(1), the Court reviews Mr. Augustin's motions to suppress de novo.

## II. BACKGROUND

In the summer of 2010, James Hosty and Todd Goodson, agents with the Federal Bureau of Investigation ("FBI"), were investigating incidences of possible law enforcement corruption relating to an illegal nightclub. (Suppression Hr'g Tr. 4-5, Apr. 21, 2011). As a part of this investigation, Agents Hosty and Goodson "became aware" that Defendant Augustin might "be working at an illegal nightclub and possibly accepting bribes from the illegal nightclub." (*Id.* at 5).

On August 3, 2010, sometime between 2:00 p.m. and 4:00 p.m., Agents Hosty and Goodson went to Mr. Augustin's house to interview him about his involvement with the nightclub. (*Id.* at 5, 8). Both agents wore suits and were carrying concealed weapons. (*Id.* at 5, 7-8). The agents knocked on Mr. Augustin's door and identified themselves to Mr. Augustin as FBI agents when Mr. Augustin came to the door. (*Id.* at 6, 43). The agents had not informed Mr. Augustin that they intended to visit his house to interview him, but upon arrival, the agents asked if they could speak with Mr. Augustin. He agreed and invited the agents into the house and took them to an informal room in the basement of the house. (*Id.* at 6, 44).

Mr. Augustin was wearing shorts of some kind and appeared to have awoken shortly before coming to the door. (*Id.* at 6, 14, 24, 43-44). According to Agent Goodson, Mr. Augustin "was a little sleepy-eyed," told the agents he had been sleeping, and spoke "kind of low and slow." (*Id.* at 43-44). Despite appearing a little sleepy, Mr. Augustin did not appear to be under the influence of

3

any substance that would affect his ability to comprehend and to think clearly. (*Id.* at 6).

The agents spoke to Mr. Augustin in a conversational tone and were sitting down across from Mr. Augustin during the conversation. (*Id.* at 7, 15, 44). At no point did the agents tell Mr. Augustin that he was not under arrest or that he was free to end the interview or to not answer any questions. (*Id.* at 13, 23). The agents had no physical contact with Mr. Augustin and did not direct his movements in any way. (*Id.* at 7). At one point during the short conversation, Mr. Augustin stood up to use the restroom. He told Agents Hosty and Goodson where he was going and offered to leave the door open. (*Id.* at 14-15, 45-46). Agent Hosty told Mr. Augustin that was fine and simply stood up as Mr. Augustin left the room. (*Id.* at 15).

The agents informed Mr. Augustin that their purpose in interviewing him "was to find out information as far as his activities related to a club on Pryor [Street]." (*Id.* at 47). Consistent with their purpose, the agents, primarily Agent Hosty, asked Mr. Augustin whether he had ever worked at the illegal nightclub. (*Id.* at 49). The agents repeated that question "a few times," with Mr. Augustin each time answering "no." (*Id.* at 17-18, 49). The agents also asked Mr. Augustin if he had ever received any money from the illegal nightclub. (*Id.* at 17-18). Mr. Augustin stated that he had not received any money from the illegal nightclub or its owners. (*Id.*). The agents did not inform Mr. Augustin of his rights under *Miranda v. Arizona*. (*Id.* at 13).

After Mr. Augustin answered these questions, the agents informed Mr. Augustin that he could be charged by a grand jury indictment for providing false information to a federal officer. (*Id.* at 49). Mr. Augustin then asked the agents if he could speak to an attorney. (*Id.* at 22, 49). The agents then stood up, gave Mr. Augustin a business card, informed Mr. Augustin that his attorney could contact them if Mr. Augustin wanted to provide any further statements, and walked to the door. (*Id.* at 22). At that point, Mr. Augustin called out, "Wait, come back." (*Id.*). The agents came back, but Mr. Augustin had nothing further to say. (*Id.*). The agents then left Mr. Augustin's home. (*Id.*). The entire interaction lasted for no more than fifteen minutes. (*Id.* at 6, 46). The Court provides further facts below as needed.

### III. DISCUSSION

Any statements a suspect makes in response to custodial interrogation without a valid advisement of his right to remain silent, his right to have an attorney, and his right to receive free legal advice if he cannot afford an attorney under the Fifth Amendment to the Constitution of the United States and under *Miranda v. Arizona*, 384 U.S. 436, 467-79 (1966), must be suppressed. In determining whether a person is in custody for the *Miranda* analysis, the relevant inquiry is whether a reasonable person in the suspect's position would consider himself deprived of his freedom of action in a significant way at the time of questioning. *See Thompson v. Keohane*, 516 U.S. 99, 107, 113 (1995)

(observing that the "crucial question" for a court in determining whether a person was in custody is whether a "reasonable person" in the same circumstances would have felt "deprived of freedom of action in any significant way"). Interrogation includes any words the officer speaks or any actions the officer takes that the officer "should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Additionally, any statement a defendant involuntarily makes to law enforcement must be suppressed under the Fourteenth Amendment's due process protections. *See Spano v. New York*, 360 U.S. 315, 320-21 (1959) (observing that "abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."); *see also Townsend v. Sain*, 372 U.S. 293, 308 (1963) ("Any questioning by police officers which in fact produces a confession which is not the product of a free intellect renders that confession inadmissible."), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992).

Defendant Augustin's objections to the Magistrate's report and recommendation center on the weight that the Magistrate placed on the circumstances courts focus on in determining whether an officer's actions would reasonably deprive a person of his freedom of action in any significant way versus

the weight that the Magistrate placed on the officers' decision to not inform Mr. Augustin that he was not under arrest and was free to terminate the encounter at any time. (Doc. 27 at 6). Defendant Augustin relies almost exclusively on *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), and *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), in these objections.

In *Brown*, the Eleventh Circuit found the fact that officers repeatedly informed the defendant in that case that he was not under arrest and was free to leave at any time significant enough to counter evidence of police actions normally associated with formal arrest in determining that the defendant was not in custody for *Miranda* purposes at the time of his interrogation. 441 F.3d at 1347-48. Police had arrived at the suspect's house to question him about and search the premises for evidence of a recent murder. Upon arriving at the house, an officer asked the suspect if he would come to the police station to be interviewed. *Id.* at 1344. As the suspect was looking for a pair of shoes to don for the trip, an officer followed the suspect around the house "for safety reasons." *Id.* at 1345. Law enforcement confiscated the shoes the suspect wanted to wear as evidence, leaving the suspect barefoot. *Id.*

Officers asked the suspect if he would mind staying at the house for the interview. The suspect agreed. *Id.* At several points during the interaction, the suspect asked the officers if he could do certain things like smoke and move about the house. *Id.* The officers told him that he "could do anything he wants. We were in his house with his consent . . . ." *Id.* At various points, however, officers

7

directed the suspect to sit in certain places for periods of time and to notify them before he made any sudden movements. *Id.* at 1345-46. Some of the investigators at the house were armed and visibly displaying weapons, but none of the interviewing officers had any weapons. *Id.* at 1345.

The suspect testified at the suppression hearing that police entered the house with guns drawn, ordered him to sit in a chair, prevented him from moving freely around the house, and never told him that he was free to leave. In weighing the testimony of the officers against the testimony of the suspect, the magistrate judge found that the officers repeatedly told the suspect that he was not under arrest and was free to leave at any time. *Id.* at 1346. The magistrate judge also found that the suspect understood that he was not under arrest and was free to leave at any time. *Id.* Under those circumstances, the *Brown* court found that the officers repeatedly telling the suspect that he was not under arrest and was free to leave at any time justified affirming the trial court's refusal to suppress the suspect's confession at the home. *Id.* at 1346-48.

In *Griffin*, law enforcement suspected that a man had been involved in an armed robbery at a bank. 922 F.2d at 1345-46. Two federal agents went to the man's stepfather's house where the man lived. *Id.* at 1346. The agents arrived at the house before the man. When the man arrived, the agents informed the man that they were there to speak to him about a bank robbery. *Id.* At that point, the man blurted out that "[t]he gun wasn't loaded." The agents proceeded to direct the man's parents to another room so that the agents could speak to the man

8

privately. *Id.* The agents escorted the man around the house when he needed something from another room and told the man to stay in their line of sight at all times. During the interview, the man appeared nervous and seemed fearful of the agents. *Id.* The agents never told the man that he was not under arrest or that he was free to leave or advised the man of his *Miranda* rights while at the house. *Id.* After two hours of questioning, the man implicated himself and a co-defendant in the bank robbery. *Id.*

In its discussion of the factors it considered in determining whether the man's confession was the product of custodial interrogation, the *Griffin* court identified the officers' statements to the man that he was not under arrest and was free to leave at any time as "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody or otherwise deprived of [his] freedom of action." *Id.* at 1349 (internal quotation marks omitted). The court also noted that although the interview took place in the man's home, "the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting." *Id.* at 1354-55. Given all of these circumstances, the *Griffin* court found that the man's confession was the product of custodial interrogation. *Id.* at 1355.

In Mr. Augustin's case, there is no evidence of police domination. Agents Goodson and Hosty contacted Mr. Augustin at his home in the middle of the afternoon. The agents asked to speak with him, giving him the chance to decline. Mr. Augustin invited the agents into his house, agreed to speak with them, and

took them into a room where they could have a private conversation. When Mr. Augustin needed to excuse himself to use the restroom, he chose to offer to keep the door open so that the officers could have an opportunity to keep an eye on him. True, the agents did not tell Mr. Augustin that he was free to leave at any time. But the agents did not restrain Mr. Augustin in any way. They did not direct his movements in any way. They did not separate him from his family members who could provide support and comfort; Mr. Augustin was the one who initiated the private setting.

Perhaps most importantly here, Mr. Augustin is not a naïf in the criminal justice world. At the time of the interview in August 2010, Mr. Augustin had been an officer with the Atlanta Police Department since 2004 or 2006. (Suppression Hr'g Tr. 35, Apr. 21, 2011). As such, a reasonable person in Mr. Augustin's position would have understood that he had the right to terminate the conversation at any time—as Mr. Augustin did by asking for an attorney. Mr. Augustin clearly knew he had the right to control the conversation with Agents Hosty and Goodson because he chose to call them back after they began leaving. Thus, the Court finds that Mr. Augustin's answers to the agents' questions are not a product of custodial interrogation warranting suppression because the agents failed to advise Mr. Augustin of his *Miranda* rights.

## IV. CONCLUSION

For the foregoing reasons, the Court finds no reason to disapprove of the Magistrate's Final Report and Recommendation that Mr. Augustin's motions to suppress be denied. Thus, the Court **ADOPTS** the Magistrate's Final Report and Recommendation and **DENIES** Mr. Augustin's motions to suppress. [Docs. 12 and 21].

It is so ORDERED this 4th day of November, 2011.

_____
Amy Totenberg
United States District Judge